**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| RONALD W.,[1] | ) |
| | ) |
|      **Plaintiff,** | ) |
| | )   No. 17 CV 8536 |
| v. | ) |
| | )   Magistrate Judge Jeffrey I. Cummings |
| ANDREW SAUL, Commissioner | ) |
| of Social Security,[2] | ) |
| | ) |
|      **Defendant.** | ) |
| | ) |

**MEMORANDUM OPINION AND ORDER**

Ronald W. ("Claimant") brings a motion for summary judgment to reverse or remand the final decision of the Commissioner of Social Security denying his claim for Disability Insurance Benefits ("DIBs"). The Commissioner brings a cross-motion seeking to uphold the decision to deny benefits. The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons that follow, Claimant's motion for summary judgment (Dkt. 17) is granted and the Commissioner's motion for summary judgment (Dkt. 24) is denied.

**I.     BACKGROUND**

    **A.     Procedural History**

On October 27, 2014, Claimant (then 48 years-old) filed for DIBs alleging disability beginning on May 14, 2014 due to chronic back pain and high blood pressure. (R. 105.) His

---

[1] In accordance with Internal Operating Procedure 22 - Privacy in Social Security Opinions, the Court refers to Claimant only by his first name and the first initial of his last name.

[2] Andrew Saul is now the Commissioner of Social Security and is substituted in this matter pursuant to Fed. R. Civ. P. 25(d).

date last insured was September 30, 2016.[3] (R. 14.) Claimant's application was denied initially and upon reconsideration. (R. 73-96, 101-05, 112-16.) Claimant filed a timely request for a hearing, which was held on October 13, 2016 before an Administrative Law Judge ("ALJ"). (R. 30-72.) Claimant appeared with counsel and offered testimony at the hearing. A vocational expert also offered testimony.

On December 21, 2016, the ALJ issued a written decision denying Claimant's application for benefits. (R. 14-24.) Claimant filed a timely request for review with the Appeals Council. (R. 173.) On September 25, 2017, the Appeals Council denied Claimant's request for review, leaving the decision of the ALJ as the final decision of the Commissioner. (R. 1-4.) This action followed.

### B. Medical Evidence in the Administrative Record

Claimant alleges disability due to back pain, high blood pressure, and depression. The records before the Court reveal a history of four back surgeries, the most recent in 2006, and, as explained in more detail below, a left hip replacement in January 2012 following a fall down the stairs. (R. 312-320, 462-587.) The administrative record contains the following additional medical evidence that bears on Claimant's claim:

#### 1. Evidence from Claimant's Treating Physicians

*Primary Care Physician - Dr. Dalawari*

Claimant has been under the care of internist Dr. S. Dalawari since as early as 2010. After falling down the stairs in August 2011, Claimant saw Dr. Dalawari and complained of lower back pain and left hip pain. (R. 681, 704.) An x-ray of his hip showed no fractures or

---

[3] To be eligible for DIBs, the claimant must prove that he was disabled before the expiration of his insured status. *Shideler v. Astrue*, 688 F.3d 306, 311 (7th Cir. 2012) (citing 423 U.S.C. § 423(a)(1)(A)).

other significant abnormalities. (R. 707.) Subsequent imaging of the left hip, however, showed osteoarthritis and labral degeneration with suspicion of a small tear. (R. 689.) Imaging of the lumbar spine revealed, among other things, a small disc protrusion at L3-L4 with mild to moderate central canal stenosis and moderate right foraminal stenosis at L4-L5. (R. 691-92.) Dr. Dalawari recommend physical therapy and prescribed tramadol for pain and cymbalta for depressive symptoms. (R. 677, 681, 693-95, 704.) Ultimately, Claimant was referred to an orthopedic surgeon for his continued hip and back pain, and he underwent a left hip replacement in January 2012. (R. 462-587, 679.) Following his hip replacement, Claimant continued to occasionally follow-up with Dr. Dalawari for medication management. (R. 666-70.)

In early 2014 - - a few months prior to his alleged onset of disability - - Claimant had few complaints though he saw Dr. Dalawari every few weeks for blood pressure checks and medication management. (R. 660-65.) By that time, Dr. Dalawari had determined that Claimant had hypertension, high cholesterol, osteoarthritis of the pelvic region and spine, depressive disorder, and lumbago. (R. 660). On June 2, 2014, Claimant complained of upper chest and back pain. (R. 656-57.) A physical exam revealed normal results. (*Id*.) Dr. Dalawari started Claimant on medrol and naproxen for pain a few weeks later (R. 653-54), and he described Claimant's pain as thoracic spine pain on June 26, 2014. (R. 650-51.)

A physical exam in June 2015 revealed tenderness of the thoracic spine. (R. 751-52.) By that time, Claimant had been prescribed morphine and vicodin for pain. (R. 752.) Lower back pain and tenderness were again noted in October 2015 and February 2016. (R. 754-59.) In June 2016, Claimant told Dr. Dalawari that his neurosurgeon, Dr. Trombly, recommended surgery, but that he was interested in a second opinion. (R. 780.) Dr. Dalawari referred Claimant to

another neurosurgeon. (R. 782.) At his annual wellness visit a few weeks later, Claimant was feeling depressed and had little interest in doing things. (R. 775.)

*Pain Management - Dr. Elborno*

On May 31, 2013, Claimant began treatment at Midwest Academy of Pain and Spine with Dr. A. Elborno. (R. 312, 321-24.) His chief complaints were left hip and leg pain since his fall, which he described as "stabbing" and rated a 5/10. (R. 321-22.) The pain was affecting his ability to walk, stand, sit, and drive. (R. 322.) Claimant also described a history of high blood pressure, asthma, and depression. (*Id*.) On exam, Dr. Elborno noted tenderness and discomfort of the lumbar spine, left leg and hip, and decreased range of motion in the left hip. (R. 323-24.) Claimant exhibited similar tenderness a few days later, at which time Dr. Elborno diagnosed him with lumbar radiculopathy and post-lumbar puncture syndrome status post four back surgeries. (R. 329-30.) Dr. Elborno contemplated a repeat MRI and "possible discography at L3-L4." (R. 330.) By June 14, 2013, Dr. Elborno had reviewed a 2007 MRI, which showed no apparent disc herniation at L3-L4. (R. 331-32.) Claimant had begun taking norco for pain. (R. 332.)

Claimant returned to see Dr. Elborno in December 2013 and continued to complain of left hip and back pain upon sitting, standing, and walking. (R. 334-35.) Dr. Elborno informed Claimant of various treatment options, including adult stem cell therapy or a spinal cord stimulation trial. (R. 335.) Claimant continued on norco and reported no recent changes at his next appointment in January 2014. (R. 336-39.) In March 2014, Dr. Elborno assessed osteoarthritis of the hip and administered a steroid injection. (R. 342-44.) Claimant's lower back and hip pain were "well controlled" with medications in May 2014. (R. 347-48.) But, at his next appointment in June 2014, Claimant stated that his hip pain was "getting worse" with additional thoracic back pain, and that his medication was "not helping much." (R. 353.) Dr.

4

Elborno again contemplated a spinal cord stimulation trial, but first recommended a psychological evaluation, and further noted that "patient doesn't want to be on narcotics." (*Id.*) Notwithstanding this, Dr. Elborno prescribed norco and morphine for Claimant and ordered an MRI of his thoracic spine. (R. 354.)

In August 2014, Claimant's lower back pain was well controlled with medications and he was "doing well." (R. 366-67.) He reported lower and upper back pain in October 2014, and Dr. Elborno assessed thoracic spondylosis and degenerative disc disease. (R. 369-70.) Claimant returned to see Dr. Elborno in April 2015, complaining of pain in his middle and lower back, aggravated by lifting, pushing, running, twisting, and walking. (R. 375.) He described his hip pain as "mild," but constant. Aggravating factors included walking, sitting, running and bending. (*Id.*) Pain relieving factors included medication and injections. (*Id.*) A musculoskeletal examination was normal. (R. 376.) Dr. Elborno reported Claimant was "doing well" but nonetheless directed him to continue taking norco and morphine. (R. 377.)

Claimant followed-up with Dr. Elborno every few months throughout 2015 and into 2016, with continued complaints of back and left hip pain, which he categorized as "constant," "excruciating," and aggravated by activity. (R. 740-49.) Dr. Elborno continued Claimant on the prescribed pain medication. (*Id.*) Claimant returned in May 2016 and again complained of pain aggravated by sitting, standing, and movement. (R. 769.) A lumbosacral exam showed "tenderness, increased with exertion and lateral rotation bilateral with restriction and discomfort with range of motion bilaterally. Spasm [was] noted to palpation of the lumbar paraspinal areas." (*Id.*) Dr. Elborno described Claimant's pain as "well-controlled on medication" in June 2016. (R. 788.) Dr. Elborno noted tenderness and spasms of the lumbosacral area in July 2016. (R. 793.) Claimant continued taking morphine and vicodin. (R. 794-95.) In September 2016,

5

Claimant's "pain severity [was] tolerable with medications, excruciating without medications."
(R. 832.) Tenderness and discomfort upon range of motion were again noted. (*Id*.)

*Neurosurgeon - Dr. Trombly*

After he had been examined by the state agency's consultants (*infra,* at pages 8-9), Claimant - - upon Dr. Dalawari's referral - - saw neurosurgeon Dr. R. Trombly on July 30, 2015 for his continued back pain between his shoulders down to the lower back. (R. 729.) Claimant told Dr. Trombly that he was doing "pretty well" after his hip replacement until May 2014 when he began having constant pain in his back. (*Id*.) He further reported he had been out of work since May 2014 due to back pain. (*Id*.) Upon examination, Claimant exhibited a slightly kyphotic (or rounded) posture. (R. 730.) Dr. Trombly reviewed an MRI of the thoracic spine from September 2014, which showed "no compression with mild kyphosis most pronounced in lower thoracic region." (*Id.*) Dr. Trombly assessed mechanical back pain and recommended physical therapy, posture training, and a CT of the lumbar spine if the pain continued. (*Id*.)

As of October 20, 2015, Claimant had not started physical therapy due to insurance reasons. (R. 732.) He told Dr. Trombly he continued to have constant 4/10 sharp pain in his mid-back, which increased to 10/10 with activity. (*Id*.) His back pain was relieved upon laying down and aggravated by sitting and physical activity. (R. 732.) A physical exam was normal. (R. 732-33.) Dr. Trombly reviewed the recent lumbar CT scan and noted postoperative and degenerative changes in the lumbar spine. (R. 733.) He assessed lumbar degenerative disc disease, lumbar spondylosis, and thoracic spondylosis with radiculopathy. (*Id*.) Dr. Trombly recommended further imaging, a trial of epidural injections, and, if pain persists, a L3-S1 laminectomy.[4] (*Id*.) Claimant's pain was "the same" in January 2016 and was limiting his

---

[4] Laminectomy, also known as decompression surgery, is a surgery that creates space by removing the lamina, the back part of a vertebra that covers your spinal canal. Laminectomy is generally used only

activities to "1-2 hours max then [he] has to sit." (R. 735.) The physical exam was normal apart from Claimant's continued rounded posture. (R. 735-36.) Updated imaging showed mild degenerative changes in the thoracic spine. (R. 736.) Dr. Trombly again ordered more imaging and physical therapy. (*Id*.)

In May 2016, Claimant reported minimal relief from his pain medications and said that he could not "walk even several blocks" or stand for prolonged periods. (R. 783.) Dr. Trombly planned to review recent CT images and then consider a "revision L3-S1 decompression." (*Id*.) By October 2016, Dr. Trombly reviewed the CT scans, which showed mild foraminal stenosis of the lumbar spine and severe foraminal stenosis of the thoracic spine. (R. 835.) Dr. Trombly again assessed thoracic spondylosis with radiculopathy and stated that Claimant may need injections or a thoracic laminectomy to decompress thoracic nerve roots. (*Id*.)

***Psychological Assessment – M. Langgut, Ph.D***

On June 8, 2015, Claimant underwent a psychological assessment with clinical psychologist Dr. M. Langgut at the referral of his attorney. (R. 760-66.) Claimant told Dr. Langgut that he was diagnosed with depression in 2010, which was "directly related to his significant back pain and limited ability to sit, stand or sleep adequately." (R. 761.) Claimant said that his depression was currently at its most intense in the past year and explained that he feels "overwhelmed by the chronicity of his condition and his inhibited activity level." (R. 764-65.)

Dr. Langgut reviewed Claimant's mental and physical history and conducted a mental status exam. Dr. Langgut noted "immature" judgment skills and limited reasoning and

---

when more conservative treatments, such as medication, physical therapy, or injections, have failed to relieve symptoms. *Laminectomy*, Mayo Clinic, https://www.mayoclinic.org/tests-procedures/laminectomy/about/pac-20394533 (last visited July 2, 2019).

computational skills. (R. 764.) He ultimately assessed major depressive disorder, with the recommendation for follow-up to rule out opioid addiction. (R. 766.) Dr. Langgut opined that Claimant would be capable of maintaining substantial employment with reasonable accommodations such as frequent breaks, an optional standing desk, and lumbar support equipment for seating. (R. 765.) He questioned Claimant's ability to pass an employer's drug screening test in light of his continued use of opioids for pain. (*Id*.)

## 2. Evidence from Agency Consultants

On January 16, 2015, Claimant underwent a consultative exam with Dr. R. Karri. (R. 635-38.) Claimant described a history of low back pain, hypertension, hyperlipidemia, asthma, four back surgeries, and a hip replacement. (R. 635-36.) Claimant told Dr. Karri that he continues to get stabbing pain in his hip after sitting for long periods and while walking. (R. 635.) Claimant reported that his back pain improved after the surgeries, but returned in May 2014. (R. 636.) He described pain that "radiates to the interscapular area" and explained that an MRI from 2014 showed a ruptured disc. (*Id*.) He had been seeing a pain specialist for six months and was being treated with morphine, with some relief. (*Id*.) Claimant explained that he could not work for more than 1 to 3 hours due to pain. (*Id*.) He confirmed that he could drive and do "some chores." (*Id*.) Claimant said he has had asthma for "many years" and uses an inhaler occasionally. (*Id*.)

Upon physical examination, Claimant was noted as obese and exhibited a decreased range of motion and tenderness of the lumbar spine. (R. 637.) The neurological and mental status examinations were within normal limits. (*Id*.) An x-ray of the lumbar spine revealed degenerative disc disease at L3-4. (R. 639.) Dr. Karri assessed a history of low back pain and

8

surgeries, with mildly decreased range of motion, hypertension, hyperlipidemia, and asthma (all under control), and obesity. (R. 638.)

On February 11, 2015, at the initial level, another state agency consultant (Calixto Aquino, M.D.) determined that Claimant could perform light work except he could frequently climb and stoop. (R. 73-82.) On June 2, 2015, at the reconsideration level, yet another agency consultant (Patricia Bush, M.D.) found that Claimant could perform light work, except he could frequently climb, occasionally stoop, kneel, crouch, and crawl, and must avoid concentrated exposure to extreme temperatures, pulmonary irritants, and hazards. (R. 85-97.) At both levels of review, the state psychological consultants found that Claimant had mild restrictions in activities of daily living and maintaining concentration, persistence, or pace. (R. 77-78, 88-90.)

### C. Evidence from Claimant's Testimony

Claimant appeared with counsel at the October 13, 2016 hearing before the ALJ and testified as follows. At the time of the hearing, Claimant was 50 years old and residing in a house by himself. (R. 36.) He was 6'2" tall and weighed 265 pounds. (*Id*.) He completed high school and, from 1988 – 2013, worked as a sheet metal installer, installing heating and air systems. (R. 38.) In that line of work, Claimant regularly lifted 50 pounds. (R. 41.) Claimant was fired in 2013 because "they thought [he] was a whistleblower." (R. 40.)

According to Claimant, he is unable to work because of severe back pain and depression. (R. 40.) Claimant described a history of four back surgeries and a hip replacement. (R. 42.) He explained that his pain is located between his shoulder blades and his lower back and is worsening with time. (R. 41-42.) Claimant explained that his pain began after he helped a family member remodel a bathroom in May 2014. (R. 53.) Claimant takes morphine twice a day

and vicodin every six hours. (R. 43.) He has tried injections in the past, but they did not help. (R. 44.) Claimant's neurosurgeon has recommended another surgery. (R. 53.)

At the hearing, Claimant rated his pain a seven or eight on a ten-point scale, despite having taken his medication that day. (R. 41.) Claimant said that "on a good day" (usually once a week) he can walk about 100 feet before needing to stop and stretch due to pain. (R. 45-46.) He can stand for five minutes and sit for half an hour at a time. (R. 46.) He can lift five to ten pounds and carry a bag of groceries. (*Id.*)

When asked about his depression, Claimant testified that he is very short-tempered and depressed "all the time." (R. 47.) He has suicidal thoughts "every day." (R. 49.) At the time of the hearing, Claimant was not seeing anyone for depression or taking medication. (R. 42-43.) He said he stopped taking medication for depression four years ago due to concerns related to diabetes. (R. 43.) Claimant's blood pressure and cholesterol are controlled with medication. (R. 44.) He uses an inhaler for asthma three to four times a week. (R. 44.)

Claimant spends most of his time watching TV while sitting in his recliner chair with a heating pad. (R. 48.) He can make simple meals in the microwave and take care of his personal needs. (*Id.*) His son comes over to do most of the household chores. (R. 49.) He goes grocery shopping once or twice a week, but otherwise does not leave the house to socialize. (R. 50.) Claimant does not drive for long periods of time due to back pain and the effects of his medication. (R. 37.)

### D. Evidence from the Vocational Expert's Testimony

A vocational expert ("VE") also offered testimony at the hearing before the ALJ. The VE first described Claimant's past work as a sheet metal worker, which is medium and skilled under the Dictionary of Occupational Titles ("DOT"), but heavy as performed. (R. 59-60.)

Next, the ALJ asked the VE to consider a hypothetical individual of claimant's age, education, and experience who was limited to less than the full range of light work in that he could: frequently climb ladders, ropes, scaffolds, ramps, and stairs; occasionally stoop, kneel, crouch, and crawl; and could have infrequent exposure to unprotected heights, but frequent exposure to dust, odors, fumes, other pulmonary irritants, and extreme temperatures. (R. 60.) The VE explained that such an individual could not perform Claimant's past work as a sheet metal worker. (*Id.*) But the individual could perform work in the national economy, including in the representative light/unskilled positions of production solderer, plumbing hardware assembler, and hardware assembler. (R. 61.) The same jobs would be available if the individual was further limited to only occasionally climbing ramps and stairs, and never ladders, ropes, or scaffolds. (R. 61.) However, an individual who required a sit/stand option throughout the day could not perform any light jobs or any sedentary jobs due to a lack of transferable skills. (R. 61-62.)

Upon questioning by Claimant's counsel, the VE explained that although the published DOT had not been updated since 1992, it is "updated on a regular basis through ONET," and is otherwise supplemented with occupational handbooks. (R. 65.) The VE agreed that certain DOT jobs no longer exist in the economy because of advancements in technology. (R. 67.) The VE also confirmed that she had not provided the approximate number of jobs available in the representative positions in the Chicago area. (R. 67-68.) Lastly, the VE confirmed that she had not considered whether potential employers would screen for opiates or psychological problems. (R. 69.)

E.    **Evidence from Third-Party Function Report**

On January 4, 2015, Claimant's wife completed a third-party function report, setting forth Claimant's limitations. (R. 224-231.) She explained that Claimant could not stand, walk, or sit

11

for long periods of time, performed very few household tasks, and could lift only about five pounds. (*Id.*) According to Claimant's wife, he "was a very active man before chronic pain set in." (R. 228.)

## II. LEGAL ANALYSIS

### A. Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. §405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Consequently, this Court will affirm the ALJ's decision if it is supported by substantial evidence. *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015). Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Biestek v. Berryhill,* 139 S.Ct. 1148, 1154 (2019), *quoting Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1983).

This Court must consider the entire administrative record, but it will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011). This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Court will focus on whether the ALJ has articulated "an accurate and logical bridge" from the evidence to his/her conclusion. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). At a minimum, the ALJ must "sufficiently articulate [his or her] assessment of the evidence to 'assure us that the ALJ considered the

important evidence ... [and to enable] us to trace the path of the ALJ's reasoning.' " *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993) (per curiam), *quoting Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir. 1985) (internal quotations omitted). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart,* 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder v. Astrue,* 529 F.3d 408, 413 (7th Cir. 2008).

B.    **The Standard for Proof of Disability Under The Social Security Act**

In order to qualify for DIBs, a claimant must be "disabled" under the Act. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon,* 270 F.3d at 1176. Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008). The claimant has the burden of establishing a disability at steps one through four. *Zurawski v.*

*Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id*. at 886.

### C.     The ALJ's Decision

The ALJ applied the five-step inquiry required by the Act in reaching his decision to deny Claimant's request for benefits. At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since his alleged onset date of May 14, 2014 through his date last insured of September 30, 2016. (R. 16.) Next, at step two, the ALJ determined that Claimant suffered from the severe impairments of degenerative disc disease and obesity. (R. 16.) The ALJ explained that Claimant's hypertension, hyperlipidemia, asthma, and affective disorder were non-severe. (R. 16-17.) At step three, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the Commissioner's listed impairments. *See* 20 C.F.R. Part 404, Subpart P, App. 1.

The ALJ went on to assess Claimant's RFC, ultimately concluding that he had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), except that he could never climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; and could have frequent exposure to unprotected heights, moving mechanical parts, pulmonary irritants, and extreme temperatures.[5] (R. 18-22.) The ALJ relied on evidence including the opinions of the state agency consultants (which were rendered by early June 2015) and his own assessment of the post-June 2015 medical evidence provided by Dr. Trombly to

---

[5] The Social Security Administration defines light work as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. § 404.1567(b).

14

formulate the RFC. (R. 19-22.) Based on this RFC and the testimony of the VE, the ALJ determined at step four that Claimant could not perform his past work as a sheet metal worker. (R. 22.) However, at step five, the ALJ concluded that Claimant had the RFC to perform work in the national economy, including in the light, unskilled representative positions of production solderer (20,000 jobs nationally), plumbing hardware assembler (10,000 jobs nationally), and hardware assembler (10,000 jobs nationally). (R. 23.) As such, the ALJ found that Claimant was not under a disability from his alleged onset date through his date last insured (September 30, 2016). (*Id.*)

### D. The Parties' Arguments in Support of their Respective Motions for Summary Judgment

In his motion for summary judgment, Claimant first argues that the ALJ erred by giving great weight to the opinions of the state agency medical consultants when formulating Claimant's RFC. According to Claimant, a significant amount of medical evidence regarding Claimant's condition was submitted after the agency consultants' review in early to mid-2015, leaving the consultants' opinions based on an incomplete record. In Claimant's view, the ALJ improperly played doctor when he reviewed and assessed the later submitted evidence without obtaining an updated medical opinion. Claimant further argues that the ALJ failed to properly consider Claimant's alleged limitations in sitting and standing and, for a number of reasons, failed to engage in a proper analysis of his subjective symptoms.

In response, the Commissioner argues that the medical evidence submitted after the agency consultants' review was not as significant as Claimant contends and, more importantly, that the ALJ properly considered that evidence when assessing Claimant's RFC. According to the Commissioner, Claimant failed to show that the additional medical evidence necessitated an updated medical opinion. The Commissioner argues further that the ALJ's RFC assessment and

15

subjective symptom analysis were otherwise supported by substantial evidence, namely Claimant's "conservative treatment; mostly normal or mild findings from multiple exams; evidence demonstrating that [Claimant's] medications consistently controlled his symptoms; and medical source opinions consistent with a finding of non-disability." (Dkt. 25, at 3.)

> E. **Remand is Required Because the ALJ Failed to Submit New and Potentially Decisive Medical Evidence for Medical Scrutiny.**

Claimant first takes issue with the ALJ's decision to afford the opinions of the state agency consultants' great weight when significant medical evidence regarding Claimant's condition was submitted after those opinions were rendered. According to Claimant, the more recent records -- namely those from Dr. Trombly showing significant degenerative changes in the thoracic region -- support his alleged limitations in standing and walking at a level below that required for light work. This evidence is potentially decisive because the Commissioner does not dispute Claimant's assertion that he would be found disabled under Medical-Vocational Rule 201.14 *if* he were found to be more limited in his ability to stand and walk and thereby limited to sedentary work. *See* 20 C.F.R. Pt. 404, Subpart P, Appendix 2 § 201.14.

"The RFC is an assessment of what work-related activities the claimant can perform despite [his] limitations." *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). The task of assessing a claimant's RFC is reserved to the Commissioner. *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). "In determining what a claimant can do despite his limitations, the [ALJ] must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do." *Id*. Such evidence includes the claimant's medical history; the effects of treatments that he or she has undergone; the reports of activities of daily living ("ADL"); medical source statements; and the effects of the claimant's symptoms. Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *5 (July 2,

1996). It is well settled, however, that "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996); *see also Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014), *as amended on denial of reh'g* (Oct. 24, 2014).

Here, when fashioning the RFC, the ALJ assigned the opinions of the state agency consultants "great weight as they are generally consistent with the overall record which shows conservative treatment…" (R. 21.) As explained above on page 9, the state agency consultants concluded that Claimant could perform light work. It is undisputed, however, that the state agency consultants did not consider any evidence submitted after June 2015. This post-June 2015 evidence includes records concerning Claimant's repeated follow-up appointments with Dr. Elborno at the pain management clinic and all records from Claimant's treatment with his neurosurgeon, Dr. Trombly. Although the ALJ (a layman) reviewed and summarized the post-June 2015 records, this was insufficient as explained below and a remand is required.

The Seventh Circuit has made it clear that "ALJs may not rely on outdated opinions of agency consultants 'if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion.'" *Lambert v. Berryhill,* 896 F.3d 768, 776 (7th Cir. 2018), *quoting Moreno v. Berryhill,* 882 F.3d 722, 728 (7th Cir. 2018); *Stage v. Colvin,* 812 F.3d 1121, 1125 (7th Cir. 2016) (holding that the ALJ erred by evaluating medical evidence of "significant, new, and potentially decisive findings" himself "[i]nstead of consulting a physician"); *Goins v. Colvin,* 764 F.3d 677, 680 (7th Cir. 2014) (remanding where, among other things, the ALJ failed to submit new MRI to medical scrutiny, which "she should have done since it was new and potentially decisive medical evidence.").

In this case, the evidence contained in the post-June 2015 records - - which includes Dr. Trombly's opinion that a CT scan of Claimant's thoracic spine showed severe foraminal stenosis, lumbar degenerative disc disease, lumbar spondylosis, and thoracic spondylosis with radiculopathy (R. 733, 736, 835, 840, 843, 876) - - was potentially decisive and reasonably could have changed the opinions of the agency consultants.[6] Dr. Trombly, who contemplated surgical intervention for Claimant on each of Claimant's multiple visits, prepared records which show a worsening of Claimant's thoracic spine from "no compression" in 2014 to "severe stenosis" by October 2016. There can be little dispute that such a worsening of compression in the thoracic spine, along with well-documented lumbar degenerative disease and an extensive surgical history,[7] might reasonably relate to Claimant's ability to walk, stand and sit. Indeed - - as the Commissioner acknowledges - - the ALJ considered the post-June 2015 records and "found greater limitations were warranted with respect to various postural activities" than the agency consultants had found. (Dkt. 25, at 3 (citing to R. 21).)

The Court rejects the Commissioner's argument (Dkt. 25, at 4-5) that the ALJ's assessment of the post-June 2015 evidence was sufficiently thorough to dispense with the need for a remand to obtain an updated medical opinion. The Seventh Circuit has held "repeatedly that an ALJ may not 'play[] doctor' and interpret 'new and potentially decisive medical

---

[6] The Court rejects the Commissioner's attempt to minimize Dr. Trombly's review of the most recent CT scan because the CT itself is not in the record. The Commissioner provides no reason to believe that Dr. Trombly's review of the CT scan is inaccurate.

[7] The Court notes that Claimant previously underwent four back surgeries and a hip replacement. Although those procedures took place before Claimant's alleged onset of disability, on this record, they cannot logically be ignored as irrelevant to Claimant's condition following his alleged onset. *See Samuel v. Berryhill*, No. 17 C 4596, 2018 WL 1706370, at *3 (N.D.Ill. Apr. 9, 2018) ("The ALJ should consider the record as a whole, including pre-onset evidence (particularly relating to a degenerative condition) and post-onset evidence.") (citation omitted).

evidence' without medical scrutiny." *McHenry v. Berryhill,* 911 F.3d 866, 871 (7th Cir. 2018), *quoting Goins,* 764 F.3d at 680. Rather, "ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves." *Moon,* 763 F.3d at 722. The ALJ was neither qualified nor authorized to gauge the significance of Dr. Trombly's findings concerning the worsening of Claimant's condition. *See, e.g., Stage,* 812 F.3d at 1125 ("The ALJ here was not qualified or authorized to determine that [claimant's] need for a hip replacement would not have affected her supposed ability to stand and walk for six hours a day"); *Akin v. Berryhill*, 887 F.3d 314, 317-18 (7th Cir. 2018) ("The MRI results may corroborate [claimant]'s complaints, or they may lend support to the ALJ's original interpretation, but either way the ALJ was not qualified to make his own determination without the benefit of an expert opinion."); *McHenry*, 911 F.3d at 871 ("[T]he ALJ was not qualified to assess on his own how the…MRI results related to other evidence in the record.").[8]

In sum: the ALJ erred by failing to submit Claimant's post-June 2015 medical records for medical scrutiny and by instead taking it upon himself to assess the significance of this evidence. This error is not harmless because the Court is not convinced that the ALJ would reach the same result if he obtained and reviewed an updated medical opinion that considered the post-June 2015 evidence provided by Dr. Trombly. *See Lambert,* 896 F.3d at 776 ("An error is harmless

---

[8] The cases cited by the Commissioner are factually distinguishable. In one case, the claimant - - who was a diagnosed malinger - - initially sought disability benefits based upon one condition (the loss of an eye) and later contended that he was disabled by a succession of other conditions that he asserted in serial fashion. *Kendrick v. Shalala,* 998 F.2d 455, 457-58 (7th Cir. 1993). The Seventh Circuit held that the district court erred by ordering a remand to conduct a third hearing to address claimant's latest asserted condition (alcoholism) when the record established that there was substantial evidence to support the denial of benefits. *Id.* In a second case, the Seventh Circuit confirmed that an ALJ need not order a consultative examination where there is no gap in the medical evidence that a consultative examination would have filled. *Skinner v. Astrue,* 478 F.3d 836, 844 (7th Cir. 2007). In this case, the issue is not whether the ALJ should have ordered a consultative examination in the first instance, but rather whether new and potentially decisive medical evidence should be submitted to the state agency consultants so that they could update their medical opinions.

only if we are convinced that the ALJ would reach the same result on remand"). A remand is required so that the ALJ can reevaluate Claimant's RFC based upon opinion evidence from medical experts who have taken into consideration the entirety of the record including the post-June 2015 medical evidence. Because a remand is required for this reason, this Court will not address the remainder of Claimant's arguments.

## III. CONCLUSION

For the foregoing reasons, Claimant's motion for summary judgment (Dkt. 17) is granted and the Commissioner's motion for summary judgment (Dkt. 24) is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this Memorandum Opinion and Order. On remand, the ALJ shall submit Claimant's post-June 2015 medical records for medical scrutiny and re-assess Claimant's RFC based the entire case record.

ENTERED:

**Jeffrey I. Cummings**
**United States Magistrate Judge**

**Dated: August 19, 2019**